WILLIAM E. HIGMAN v. CHARLES STEWART, HELEN L.
STEWART, WELLINGTON STEWART AND THOMAS M. JONES.

*No consideration for assumption of incumbrances cut off by execution sale—Acceptance of deed.*

A foreclosure suit can be defended only on the grounds set up in the answer.

Where a defense is based solely on complainant's testimony, it is presumable that it could not have been strengthened by the testimony of others.

Acceptance by the donee is necessary to perfect a gift, except where the donor makes himself trustee for the donee.

One's assent may be presumed to that which benefits him, but not to that which prejudices him.

Reception and retention of a deed of gift are not conclusive evidence of its acceptance. There must be intelligent assent.

Possession under a sheriff's deed cuts off incumbrances later than the levy, and the judgment debtor's entire interest besides, so that a subsequent quit-claim by the debtor to the holder of the deed is without consideration and cannot bind the grantee by any stipulation which it may contain that he shall be liable for the amount of the levy and of later mortgages upon the property.

Appeal from Berrien. Submitted January 30. Decided April 3.

FORECLOSURE. Stewart, being indebted to Higman, gave him a mortgage on his farm and also assigned to him as farther security, a mortgage that had been given to himself on certain mill property already subject to two mortgages and an execution sale. Higman afterwards took an assignment of the certificate of execution sale, and as there was no redemption he received a sheriff's deed of the property. After he had taken possession, the original owners who had mortgaged the property to Stewart conveyed it to Higman with a covenant against all incumbrances except the levy and sale and the three mortgages. The deed also contained this clause, "All these incumbrances the party of the second

38 MICH.—65.

part agrees and undertakes and promises to pay as part of the consideration hereof." The defense was that Stewart was indorser for the owners of the mill property, who were indebted to a bank of which Higman was president, and that as Higman insisted upon security from Stewart, the latter took up the note to the bank and gave him a mortgage on his farm, whereby the owners of the mill property became indebted to Stewart and accordingly gave him the third mortgage to secure that and other debts. Defendant claims that as Higman has bought the property and assumed the incumbrances he is actually liable to him (Stewart) for the amount of these other debts covered by the third mortgage which he (Stewart) had assigned to him. A decree of foreclosure and sale was granted to complainant and defendants appeal.

*N. A. Hamilton* and *O. W. Coolidge* for complainant. Retention of a void instrument must be intentional and work some injury to a third party, to amount to an acceptance, *Fonda v. Sage*, 46 Barb., 123; *Sparrow v. Kingman*, 1 Comst., 253; a grantee is not bound by recitals in a deed made to him by parties who have no title, especially where he holds under a prior independent conveyance, *Coakley v. Perry*, 3 Ohio St., 344; *Carpenter v. Buller*, 8 M. & W., 209: 2 Smith's Lead. Cas., 711; *Murphy v. Jones*, 7 Ind., 529.

*Clapp & Fyfe* for defendants Charles and Helen Stewart. A mortgage placed in one's hands as a fund from which to pay the note it secures cannot be defeated by the holder by purchasing the land on an execution sale, *Green v. Winter*, 1 Johns. Ch., 36; *Sheldon v. Rice*, 30 Mich., 301; *Kellogg v. Wood*, 4 Paige, 621; *Iddings v. Bruen*, 4 Sandf. Ch., 263; *Torrey v. Bank*, 9 Paige, 662; *Van Epps v. Van Epps*, 9 Paige, 237; *Hawley v. Cramer*, 4 Cow., 736; *Diefendorf v. Spraker*, 6 Seld., 246; acceptance of a deed is presumed from possession, *Dawson v.*

*Hall*, 2 Mich., 392; *Beers v. Beers*, 22 Mich., 42; *Verplank v. Sterry*, 12 Johns., 550; *Sicard v. Davis*, 6 Pet., 135.

GRAVES, J. May 16, 1874, the defendants Stewart and wife joined in a promissory note to complainant for $3000, payable three months after date with semi-annual interest at ten per cent. They also made their mortgage of even date, but acknowledged May 20th, to secure the same debt. It was given on the northwest quarter of the northeast quarter and the north half of the southwest quarter of the northeast quarter of section sixteen, of township five south of range nineteen west.

The debt seems to have been the unpaid remainder of an original debt of $5000 which had been incurred by Stewart and Theodore and Franklin Pew, in certain business transactions not much explained. At the time of this mortgage from Stewart to Higman, the Pews held the legal title to a mill property at the mouth of the Paw Paw and St. Joseph rivers which some time previously appears to have been regarded as quite valuable. They had become embarrassed; the property was considerably encumbered and had very much depreciated in value. Exactly what land the property includes is not certainly described in the record, but it probably embraces University lots 18, 19, 28, and a portion of lot 27.

Through its endowment fund committee the Albion College held a mortgage given by the Pews December 6, 1871, on lots 18, 28, and part of lot 27 for about $3000, and the representatives of the estate of one Becker held another on the same parcels given by the Pews Oct. 15, 1873, and calling for between $2000 and $3000.

Besides these encumbrances by mortgage there was a levy. May 18, 1874, the sheriff had levied an execution in favor of one Swinson, against the Pews, on the parcels covered by these two mortgages, and also on lots 19, 3, 11 and 12. At this stage Stewart obtained a lien. May 21st, 1874, and the next day after Stewart's acknowledg-

ment of his mortgage of $3000 to complainant, the Pews mortgaged to Stewart lots 18, 19, 28, and part of 27, for . $4100, to secure their note to him of even date for that sum, payable in two years with annual interest at ten per cent. Stewart represents that the consideration of these securities from the Pews was the $3000 he was bound to pay to complainant and $1100 of other debts the Pews owed him.

October 10, 1874, sale was made on the Swinson execution, and the whole premises covered by his levy were struck off to him in parcels, for the aggregate sum of $1048.82, and the sheriff delivered to him the necessary certificates. As the levy under which this sale was made was prior to the mortgage given to Stewart, the right acquired by the purchase under it was superior; but it was subject to the earlier mortgages to the College and Becker estate, as to lots 18, 28 and part of 27 which all covered.

September 8, 1875, and when the time for redeeming on the part of the Pews had still a month left, Stewart assigned to complainant the note and mortgage which the Pews had given for $4100.

This assignment was in form absolute, but a paper was made simultaneously from complainant to Stewart which declared that the note and mortgage were assigned as collateral security only for notes which complainant held against Stewart, and further, that the transfer was subject to the understanding that the difference between the cost of the property to complainant if it were bought by him and the amount realized if sold, should be applied towards liquidating Stewart's indebtedness to him.

September 9, 1875, the next day after the date of this transaction, complainant received an assignment of the certificate of sale under the Swinson levy. He paid $630 to obtain it. The Pews failed to redeem, and January 12, 1876, the sheriff conveyed to him and immediately, or very soon afterwards, he assumed possession under this title. After he had received this conveyance and

had taken possession under it, and on January 24, 1876, the Pews together with their wives executed to him a deed of lots 18, 19, 28 and part of 27. It recited a consideration of $1000 and contained the usual covenant of seizin, and covenanted against incumbrances except the levy and sale and except the three mortgages, and also covenanted for quiet enjoyment. But immediately preceding the attestation clause and after enumerating the before mentioned charges upon the property, it stated as follows: "All these incumbrances the party of the second part agrees and undertakes and promises to pay and discharge as part of the consideration hereof." This instrument was handed to complainant by one of the Pews and left thereafter in his possession. Shortly afterwards and before the month ended complainant transferred half of the property to Mr. Hinckley.

Meanwhile proceedings in chancery had been going on to foreclose the Albion College and Becker estate mortgages, and sales were at length advertised under decrees, for September 11, 1876. On the occurrence of the sales complainant became purchaser at both and received conveyances accordingly. The wholesale price is stated to have been $5643.83.

These purchases by complainant appear in the evidence as settled by the judge and they are therefore noticed in this connection. They occurred, however, long after the commencement of this suit, and their admission in the case is not explained.

A few weeks after the sheriff's deed and the taking of possession under it, namely, in March, 1876, the complainant filed this bill to foreclose the mortgage for $3,000 Stewart and wife gave him on the farm. It was taken as confessed by Jones and Wellington Stewart. Charles Stewart and his wife answered separately. Both admitted the note and mortgage and denied that anything was due. She alleged that the transaction was in the exclusive interest of her husband and on information and belief charged that the whole demand had been paid.

He alleged that the demand originally belonged to the First National Bank of St. Joseph, of which complainant was president, and stood against the Pews as principals and himself as endorser; that the Pews having become seriously embarrassed, the complainant as president of the bank insisted on payment or that he should give security; that thereupon he and his wife by agreement with complainant and on his suggestion, gave the note and mortgage in question and took up the note running to the bank; that by this arrangement the Pews became "obligated" to him for the $3000; that aside from this they were also indebted to him for "some $1100 for other matters," and in order to secure him for the whole, they gave him May 21, 1874, the note and mortgage for $4100, which on the 8th of September, 1875, he assigned to complainant as "farther security" for the note of $3000; that the property so mortgaged by the Pews was then valuable, and "before the hard times came on" had been "considered reasonably worth $20,000 to $30,000," and at this time was worth from "$12,000 to $15,000," and was encumbered by two prior mortgages for "about $4400;" that after such assignment and in January, 1876, complainant "bought from the said Pews the said mill property mentioned in said mortgage, and in purchasing the same he expressly undertook and promised the said Pews to pay and discharge the encumbrances on said property, and in doing so he accepted from them their deed with covenant of warranty, and which referred to this mortgage and others, and therein was written a clause to the effect that he expressly agreed to pay and discharge this and the other encumbrances, which deed he, the said William E. Higman accepted, fully understanding and agreeing to the terms thereof;" that at the time he so agreed he held the note and mortgage for $4100 "by assignment absolute in form;" "that by this transaction" with the Pews "he at once realized and received payment in full of such note and mortgage," and that there remains a balance of $1200 due defendant from

complainant. The proofs were taken in open court, and on consideration of the facts the circuit judge overruled the defense and entered the usual decree of foreclosure and sale, and the defendants Stewart and wife appealed.

Many questions of intricacy are obviously suggested by the case which do not arise at all under the proceedings. It is hence not very surprising that the discussion has dwelt on topics not embraced by the pleadings. The suit can only be defended on the ground set up in the answer (*Van Dyke et al. v. Davis et al.*, 2 Mich., 144), and the ground alleged there is single and distinct. It makes no claim that complainant's situation as mortgagee of the mortgage from the Pews to Stewart imposed any duty on him to abstain from buying for himself the prior right arising from the execution sale, and to hold and use it, after having bought it, in subservience to Stewart's interest.

The Pews are not parties, and are not shown to be irresponsible. For all that appears they may be abundantly able to meet every claim Stewart has ever had against them. Their mortgage to him was given to secure eleven hundred dollars of indebtedness beyond the sum for which he had given the mortgage in suit to complainant, and his assignment by way of mortgage to complainant of the Pew mortgage, was not only to secure the debt of $3000 represented by the mortgage in suit, but a further indebtedness likewise of several hundred dollars. We are not informed what has become of this extra indebtedness from the Pews to Stewart nor that from Stewart to complainant. Neither do we know anything concerning the application of the value of the lots included in the execution sale and not embraced in the other papers. There are many things pertaining to the series of transactions of which the mortgage in suit is one which cannot be unravelled in this litigation, and we need allude to them no further.

The exact ground of defense asserted in the answer

is in substance that complainant held the mill property mortgage under Stewart's assignment as collateral security for the three thousand dollar mortgage in suit, and whilst so holding it bound himself in an agreement with the Pews which they executed, to satisfy it as part of the consideration of his purchase from them of the premises whereby he in equity converted that mortgage into satisfaction of the mortgage debt now in suit and became trustee of the residue for Stewart.

Unless this position is sound in theory and well grounded in fact the decree below cannot be disturbed.

It is not very important now that the object of the assignment of the mill property mortgage is represented incorrectly as the securing nothing else than the debt in suit, and it is not needful to question the validity of the final consequence claimed to follow the asserted facts. The more important consideration is whether the facts prove that complainant duly contracted to pay the mill property mortgage in question either as his own debt or as the debt of the Pews.

The only evidence not documentary adduced at the instance of the defense was given by complainant.

He was called by Stewart and examined at length. The defendants did not testify. Neither did they call or procure the evidence of either of the Pews. The case was left with such statements and explanations as were called out from complainant, and it is a reasonable inference that the defense could not be improved by the oaths of the others. *Wallace v. Harris*, 32 Mich., 380, 394; *Whitney v. Bayley*, 4 Allen, 173; *McDonough v. O'Niel*, 113 Mass., 92; 1 Starkie's Ev., 762.

His evidence showed that prior to his getting title under the execution sale and whilst the Pews were still in possession and holding the equity of redemption he had some talk with them about deeding to enable him to make a conversion of the property and that he subsequently found opportunity to sell in case immediate possession could be obtained, and so informed Stewart

and that the latter observed that he could get a quit claim deed from the Pews and would do so, but he was unable to get one as he, Stewart, afterwards admitted.

His evidence further showed that these efforts to get a deed from the Pews were in October, 1875, and that he never had any later or other talk with Stewart about getting one, and there is no evidence of any negotiation between the Pews and complainant or between Stewart and complainant for any deed except the quit claim sought for in October, or any evidence that complainant expected or desired one.

The deed the sheriff gave complainant January 12, 1876, and under which he took full possession is in no manner impugned. It must be regarded as a valid and complete conveyance and hence as cutting off all right, title and interest of the Pews and vesting the equity of redemption perfectly in complainant. He was in full possession and they had no right, not even a possessory one, left to serve the purpose of a colorable conveyance or afford the semblance of a consideration to support a grantee's promise. In this state of things one of the Pews passed into complainant's hands the formal grant in question. It occurred nearly two weeks after complainant's acquisition of title and possession and the utter extinguishment of all right and interest in the Pews. The evidence of complainant explains the transaction. He was engaged in business at the bank and was busy. One of the Pews entered and addressing him observed "Here is the deed to the mill property," and at the same time handed to him the deed in question; that he was busy, and took it, and said nothing; that he did not read it or notice the clause relating to payment of the incumbrances; that he did not ask for it or pay anything for it, or put it on record. There is no evidence whatever that he regarded it as a conveyance or ever made use of it as an instrument of any value or effect. So far as appears the preparation, execution and handing over of the paper were acts purely

voluntary on the part of the Pews and the reception of it by complainant an act purely mechanical on his part. It neither conveyed nor released anything.

The Swinson levy and sale no longer constituted a mere lien to be satisfied or discharged. The proceedings had ripened into a perfect title which complainant owned, and so far as the defense in this cause is concerned, had cut off the lien of the mortgage to Stewart.

Still according to the clause designed to bind complainant, *he was to be bound*, and according to the theory of the defense *made himself bound* to the Pews to pay as consideration for this nominal grant, not only the two early mortgages amounting to between $5000 and $6000, but also in some way to "pay and discharge" as though it were an incumbrance of a little over $1000, his own complete title under the execution, and likewise to "pay and discharge" the mortgage of $4100 which was no longer an incumbrance on the property.

In short, if we set aside a most important fact and consider the right under the execution as only a lien for the amount of the sale, in order to avoid the absurdity of an agreement to "pay and discharge" an absolute title owned by the promisor, the position at last is that complainant promised to sink over $5000 for nothing.

Passing from this long statement of facts we may first inquire whether the doctrine which makes a grantee responsible to a mortgagee in consequence of a provision in the grant that the grantee assumes the payment of the mortgage debt, is applicable to the claim made by the defendant Stewart. The doctrine has been maintained in two forms. The first, where a special agreement has been made between the *seller* of the equity of redemption and the *purchaser* that the mortgage debt shall be considered purchase money, but be left in the hands of the purchaser for the use of the mortgagees: and this, it has been said, affords a valid basis for a direct claim by the mortgagee against the purchaser thus holding the mortgage debt for his use.

*Cumberland v. Codrington*, 3 Johns. Ch., 254; *Garnsey v. Rogers*, 47 N. Y., 233.

This view, however, has been expressly overruled by courts of high authority, and upon the ground of want of privity on the part of the mortgagee. *Mellen, Adm'x. v. Whipple*, 1 Gray, 317; *Pettee v. Peppard*, 120 Mass., 522; *Kearney v. Tanner*, 17 S. & R., 94, 97; *Daniel v. Leitch*, 13 Gratt., 195.

Granting that the doctrine is sound, yet it appears clear that the facts do not make out a case to meet it. *Girard Life Insurance, Annuity and Trust Co. v. Stewart*, 86 Penn. St., 89. It was incumbent on Stewart to prove at least that it was understood between complainant and the Pews that there was purchase money to be left. Instead of that, however, the evidence shows that it was not so understood, and moreover that there was none in fact.

The second form accorded to the doctrine is that the grantee upon consideration agrees with the grantor to pay his debt, whereby as between them the grantee becomes principal debtor and the grantor his surety; and in accordance with the principle which in equity entitles the chief creditor to receive the benefit of a security held by a surety, the mortgagee creditor is entitled to the benefit of the agreement made by the purchaser of the equity of redemption. *Halsey v. Reed*, 9 Paige, 446; *Blyer v. Monholland*, 2 Sandf. Ch., 478; *King v. Whitely*, 10 Paige, 465; *Marsh v. Pike*, id., 595; *Garnsey v. Rogers*, supra; *Curtis v. Tyler*, 9 Paige, 432; *Stevenson v. Black*, Saxton, 338; *Tichenor v. Dodd*, 3 Green (N. J.), 454; *Crawford v. Edwards*, 33 Mich., 354; *Miller v. Thompson*, 34 Mich., 10. In this aspect the doctrine does not contemplate an obligation from the grantee to the mortgagee, but a promise from the former to the mortgagor which may be caused to inure by an equitable subrogation to the mortgagee's benefit.

Now, the Pews to whom the agreement is alleged to have been made are not parties and the practicability of

turning to Stewart's benefit by equitable subrogation in their absence from the record an obligation incurred to them is not palpable. The court seem to have thought in *Burr v. Beers*, 24 N. Y., 178, that the mortgagor as actual promissee was an indispensable party for the purpose of subrogation. Waiving this objection, however, the evidence proves that the preparation and transit of the paper were spontaneous proceedings on the part of the Pews; that they granted nothing, released nothing and suffered nothing, but voluntarily handed to complainant, who mechanically received without knowledge of its import, their written statement that he assumed their debts; and the final result is that it is not proved that they fastened the intended obligation upon him. According to the facts adduced there was no consideration to induce or support the supposed obligation and no actual assumption of the liability. The case is hence without proof of the existence of a liability to give rise to subrogation. But there is still another obstacle to the defense. The position taken requires that it should appear that the alleged obligatory clause was not only handed over by the Pews with the design that it should be effective, but was also received as a binding thing by complainant. Even to constitute a *gift*, acceptance by the donee of the thing as a gift is essential, except where the donor makes himself trustee for the donee. *Armitage v. Widoe*, 36 Mich., 124; *Hill v. Wilson*, L. R. 8 Ch. App., 888: 7 Eng., 449. The mechanical transit of the document containing the clause would not be enough. An intelligent assent,—something evincing an actual acceptance of the tendered bargain would still be necessary. It has been held that a person's assent to a matter which is obviously for his benefit may be presumed, but not where it would be prejudicial to him. Here complainant's interest was palpably adverse, and whatever presumption may be indulged must be against his having assented. The reception and retention of the paper are evidence undoubtedly of acceptance, but they are not the same thing

as acceptance, nor conclusive evidence of it. 2 Washb. Real Prop., 581 et seq. [3d ed., Vol. 3, p. 254]; *Hill v. Wilson*, supra; *Thompson v. Richards*, 14 Mich., 172; *Jackson v. Dunlap*, 1 Johns. Cas., 114; *Jackson v. Richards*, 6 Cow., 617; *Church v. Gilman*, 15 Wend., 656; *Crosby v. Hillyer*, 24 Wend., 280; *Brackett v. Barney*, 28 N. Y., 333; *Hawkes v. Pike*, 105 Mass., 560; *Shurtleff v. Francis*, 118 Mass., 154.

Other circumstances are admissible to explain or overcome their *prima facie* import, and in the present case we find a state of things which deprives them of importance. Without further reference to the facts it is enough to say that on a fair construction of the evidence it does not appear that complainant received the paper in the sense of making himself a party to it.

The conclusion reached leads to an affirmance of the decree, with costs to complainant.

The other Justices concurred.