JACKSON v. WEST.

1. TRIAL—FRAUD—PREPONDERANCE OF WITNESSES—CREDIBILITY FOR JURY.

In an action for damages for fraudulently misrepresenting the value of a land contract on a farm, a verdict for plaintiffs should not be set aside, on error, as against the great weight of the evidence, because there was a preponderance in the number of witnesses against their contention, since the credibility of the witnesses is for the jury.

On right to rely upon representations made to effect contract as basis for fraud, see note in 37 L. R. A. 593.

On applicability of statute requiring representations as to credit of another to be in writing to representations made with intent to defraud, see note in 9 A. L. R. 536.

2. FRAUDS, STATUTE OF—REPRESENTATIONS AS TO CREDIT OF AN-
OTHER.

> Under 3 Comp. Laws 1915, § 11983, favorable representa-
> tions or assurances by a father-in-law concerning the
> value of a land contract on a farm traded by his son-
> in-law, would not be actionable unless in writing and
> signed by him, in the absence of evidence that he would
> profit by the transaction or that he was acting as agent
> for the son-in-law.

3. GUARANTY—ASSIGNEE OF LAND CONTRACT COULD NOT HOLD GUAR-
ANTORS WHERE NO ACTION TAKEN TO ENFORCE PAYMENT.

> Where the assignees of the vendor's interest in a land
> contract took no action to recover the payments from the
> vendees therein, they could not hold the vendor and an-
> other as guarantors by reason of their statements that
> the contract was good and they guaranteed it.

4. CONTRACTS—EXCHANGE OF PROPERTIES A SINGLE TRANSACTION.

> In an exchange of properties, in which defendant traded
> to plaintiffs certain real and personal property, including
> his interest as vendor in a land contract, record *held*,
> to show that the deal was a single transaction and that
> the contract was not a separate and distinct part of the
> transaction, as claimed by plaintiffs.

5. VENDOR AND PURCHASER—CONVEYANCE OF LAND NECESSARY TO
TRANSFER VENDOR'S INTEREST IN LAND CONTRACT.

> Since the vendee in a land contract has but a contingent
> equitable interest in the property conveyed, subject to
> cancellation at any time until he has paid the contract
> price in full, only by the vendor's conveying the property
> and assigning the contract to his assignee could the latter
> become owner of the contract with the power to perform
> or enforce it.

6. FRAUD—WAIVER—ESTOPPEL.

> Where the assignee of a vendor's interest in a land con-
> tract on a farm and the personal property thereon allowed
> the vendee therein to dispose of his interest in both,
> thus releasing him from his obligations to pay in full,
> and later assignee traded off the farm, he is precluded by
> such conduct, which contains elements of both estoppel
> and waiver, from recovering damages from his assignor
> in an action for fraud in misrepresenting the value of the
> land contract.

Error to Ingham; Collingwood (Charles B.), J. Submitted June 12, 1923.    (Docket No. 40.)    Decided October 1, 1923.

Case by Bert E. Jackson and another against William M. West and another for fraud in an exchange of real estate.    Judgment for plaintiffs.    Defendants bring error.    Reversed.

*D. G. F. Warner*, for appellants.

*L. B. Gardner* and *Frank L. Dodge*, for appellees.

STEERE, J.    Plaintiffs had verdict and judgment against defendants for $1,800 as damages for fraudulently misrepresenting the value of a land contract involved in a land deal between plaintiffs and defendant Goetz made in December, 1920.    Jackson and Goetz were both married men and farmers by occupation, the former being 57 years of age and the latter 32.    Plaintiffs owned a farm of 115 acres located in Clinton county about 4 miles northwest of Grand Ledge which they offered for sale and had put in the hands of a real estate agent of Grand Ledge named Planck to sell, at what price the testimony does not disclose, but in the deal between these parties it was valued at $12,200.    Goetz owned a farm of 120 acres, also located in Clinton county, about 4 miles from the village of Bath and 11 miles from Lansing, upon which was a $3,000 mortgage.    He had contracted a sale of it to Uhl H. Wenk and wife for a total of $15,000 including the mortgage.    Included in the contract was also the live stock and other personal property on the place, one-half of the proceeds of which, if and when sold, was to be credited on the contract.    Defendant West, who lived in Lansing, was father-in-law of Goetz and had sold him the farm for $6,000.    In his efforts to find a customer for Jackson's

farm, Planck got into communication on the subject with defendants and a real estate agent of Lansing named Stearns who represented Goetz, and a proposal for a deal was talked over which resulted in the four going out to interview Jackson in relation to it. This was followed by a tentative understanding for a trade of property by which Goetz was to give Jackson in exchange for his farm a deed of a house and lot in Lansing valued at $6,500, subject to a mortgage of $1,200, his contract for sale of, or interest in, the Bath farm upon which there was yet unpaid, including interest, a little over $9,000 and $1,000 in cash. During their negotiations defendants offered to take Jackson over to look at the Bath farm but he did not accept their proposal. He did, however, go over with Planck to look at the house and lot in Lansing and to Stearns' real estate office where a preliminary agreement was made and a memorandum of its terms signed by the parties. The next day he went to Lansing with his wife and the parties again met at Stearns' office where the necessary papers of transfer were drawn up, by which Goetz and wife conveyed his house and lot in Lansing and the Bath farm to Jackson, subject to the mortgages upon them, and assigned the Wenk land contract to him, in consideration for which, and $1,000 to be paid in cash, Jackson and wife conveyed to Goetz his farm near Grand Ledge. Besides Jackson and Goetz, with their wives, their agents Planck and Stearns and defendant West were present. About a week later Goetz paid Jackson this $1,000 and the executed writings were exchanged. The papers were dated December 4, 1920. Goetz soon moved upon the farm he had obtained from Jackson, who lived in Grand Ledge and had been renting his place for the last six years to tenants who worked it on shares. Thereafter Wenk with Jackson's consent sold his interest in the Bath farm to a man named Gillett.

The personal property Goetz left there was sold and Jackson accepted $550 as his half of the proceeds under the provisions of the contract he then held. Jackson did not visit the farm until the following spring, and testifies that he then discovered it was an inferior, run-down place with poor buildings and much waste land, by reason of sand hills and swamps, not worth over $4,000. His reason for neglecting to see it sooner, or to investigate the value of the Wenk contract, was that during their negotiations Goetz and West both assured him the land contract he took from Goetz "was an A No. 1 contract worth 100 cents on the dollar and guaranteed it," and that he relied on their representations. Of this he further testified:

"During the interim that I had this agreement and before the deal was finally consummated, I took no pains to investigate the place or the property that I was talking of dealing for. My reason for making the deal was that I did not want to go on the farm and I wanted my money drawing interest, and they said it was good. * * * I got the Goetz farm in November, and there was quite a considerable personal property on it, I never saw the personal property. I did not go and look it up. I paid no attention to the stock that was on the farm. I knew it went with the contract but I paid no attention to that. I did not put any man on the farm to look after this property. After the personal property was sold I put a man there to look after the place. That was after we traded. The personal property was sold at the time. There was a man by the name of Wenk on this farm that bought it and gave this contract and then he sold it to a man named Gillett, here in town. Mr. Gillett gave up his end of the contract and said there was not enough in it for him, and he gave it up to me. I hadn't been on the farm before that."

As bearing on the relative values of the two farms, tax receipts for 1919 showed Jackson's farm was assessed on a valuation of $6,100 and Goetz's at $5,650. Taking Jackson's estimate of $3,000 as the

value of the property for which he traded the Bath farm, his own testimony shows that he realized in cash and property $6,580 for the farm he deeded Goetz.

The two issues of fact developed on the trial and allowed to go to the jury were whether defendants made the false representations as charged, and the value of the contract, as bearing upon which evidence of the value of the Bath farm was permitted, against defendants' objection.      Upon the latter issue plaintiffs introduced the testimony of several farmers residing in that neighborhood who described it in derogatory terms and placed a value upon it of about $4,000 in view of the quality of the land and its run-down condition, which one of them pertinently suggested had not improved since it "had been on the trading list." Their testimony was given in March, 1922, when the frenzy of war prices had abated and farm prices deflated.      The contract in question was made in February, 1920, while the farm was occupied by its owner and supplied with a full complement of stock and agricultural implements of every kind which went with the contract, consisting of 20 head of cattle, including ten cows and a Holstein bull, 5 horses, 11 pigs including 4 brood sows, 48 hens, 50 tons of ensilage, 8 tons of hay, corn, oats and fodder of different kinds, riding and walking plows and cultivators, a lever drag, manure spreader, mowing machine, side-delivery hay rake, hay loader, corn planter, corn binder, corn sheller, milking machine, cream separator, grain drill, grass seeder, a Deering grain binder, land roller, 2 lumber wagons, ditch scraper, buzz saw, bean puller, gasoline engine and tanks, food cooker, harnesses, slings and many other smaller tools and appliances of farm equipment named in the contract.      Jackson admits he knew all this went with the place but he paid no attention to it, and accepted

$550 for his interest in it.    He admitted having been offered $4,000 for the place before he traded it for other property, but said he did not accept it "because I knew he didn't have it, or I thought he did not. That was my conclusion."

Of the times and place where the charged fraudulent representations were made Jackson stated "it was there in Mr. Stearns' office in the presence of these men that Mr. Goetz and Mr. West said the contract was A No. 1, worth 100 cents on the dollar and they would guarantee it.    On the following day in the presence of these gentlemen and my wife they repeated it."    Of those present at either time only Jackson and his wife testified to such statements, while the others present testify to the contrary.    Planck, Jackson's agent, who was with him in that capacity on both occasions, testified he heard them say it was a good contract and it was talked over in a general way that it was worth its face value, but he "never heard him guarantee the payment of it, or either of them."    Although there was a preponderance in the number of witnesses to the negative of plaintiffs' contention we are not prepared to adopt as a conclusion of law defendants' contention that the verdict should be set aside as against the great weight of evidence and the case disposed of on that ground alone.    Upon that issue the credibility of the witnesses would yet be for the jury.    Defendant West not only positively denied making the representations charged, as did Goetz, but there is no evidence showing he had any financial interest in or would profit by the transaction, or suggesting that he was acting as agent for Goetz beyond the fact that he was his father-in-law and took part in their discussions.    The contracting parties personally met and negotiated, each having with him his own real estate agent.    Even if West did make the statement charged it was not in writing.

A favorable representation or assurance concerning the credit, trade, or dealings of any other person would not be ground of action against him unless in writing and signed by him (3 Comp. Laws 1915, § 11983).

Wenk and his wife are the payors who signed and promised to pay this contract. Jackson having taken no action to recover from them concededly cannot hold defendants as guarantors by reason of the language charged. *Schermerhorn* v. *Conner*, 41 Mich. 374. Realizing this, plaintiffs' counsel say "the expression 'and guarantee it' was only another catch phrase used by defendants to accomplish their fraud," and assert their action is based entirely upon the charged false and fraudulent representations made by defendants. They apparently seek to differentiate the contract from the rest of the transaction or, as the court interpreted their position to the jury, "It is the theory of the plaintiffs that the land contract was offered by defendant Goetz and his agent, West, as a separate transaction," and then instructed them that plaintiffs could not recover unless they could find by a preponderance of evidence "that the contract in question was offered as a separate and distinct part of the deal—that defendants fraudulently misrepresented the value of this contract at the time, December 4th, it was offered; that plaintiffs relied on such misrepresentation and were injured thereby," etc. In support of their theory plaintiffs' counsel point out that the evidence shows plaintiffs said during the negotiations "they wanted to dispose of their farm owing to the ill-health of Mrs. Jackson and 'quit farming'" because they "wanted their money drawing interest," and that Jackson said he wanted to "get rid of the hard labor on the farm and retire from farming," and he only took a deed of the Bath farm so "he could give a deed when the contract was paid up." If his reasons for disposing of his farm were

material, some of them are not entirely in harmony with his further testimony that he "never operated the farm at all," but since he owned it had leased it to others "on shares" and for the last seven years "lived in Grand Ledge."

We find nothing in the record showing that the contract was offered as a separate and distinct part of the transaction. The deal was a single business transaction in which Goetz traded to Jackson certain real and personal property for his farm and paid him $1,000 to boot. It was first evidenced after an agreement was reached by a single preliminary writing signed by the parties with some money paid "to bind the bargain," as Jackson states, followed by execution of proper instruments of transfer between the parties and their contemporaneous delivery when Goetz paid the $1,000 about a week later. Those instruments are not in the record and it is not shown who prepared them, but no question is raised as to their form or execution and as named they were necessary to carry out the agreement of the parties. The contract in question related to real and personal property which Goetz owned and, by it, had agreed to sell to Wenk on time.

Wenk had but a contingent equitable interest in the property subject to cancellation for default in performance on his part at any time until he had paid the contract price in full. Only by Goetz conveying the property and assigning the contract to Jackson could the latter become owner of the contract with the power to perform or enforce it.

Jackson was a man of mature years and experienced in real estate transactions both rural and urban. He testified that he had at different times owned four farms and property in two different cities. He was a farmer by vocation of many years' experience, apparently as well qualified as defendants to judge

of the value of the Bath farm, stock and equipment upon it at that time, and which they offered to take him to see during the negotiations. Defendants were strangers to him when the deal was proposed, and they were dealing at arm's length with no fiduciary relations between them. An invitation to investigate the value of stock given in exchange for real estate, though coupled with assurances as to its value, has been held to preclude recovery where the parties stand on equal terms as to opportunity of obtaining information concerning it. *Beeker* v. *Hastings*, 15 Mich. 47. The subject-matter of the value of the farm and personal property upon it was one concerning which the party to whom the representation was made had equally available means, time, experience and an invitation to investigate before closing the deal. To hold that under such circumstances there was no duty to investigate is to speak lightly of the rule of *caveat emptor*, but beyond that, plaintiffs, upon whom is the burden of proof, offer no evidence of the value of the personal property, aside from Jackson's having without investigation accepted $550 for his interest in it, nor of the financial responsibility of Wenk who was the promisor to the contract he held, bound by its terms to pay the full amount irrespective of the value of the property involved, and whom Jackson without Goetz' knowledge or consent permitted to abandon the property and dispose of his interest to another party, which by the terms of the contract he could not do without the owner's consent.

Defendants' alleged false assurances as to value, and guarantee, of this contract were made as it then stood, with Wenk and wife as the payors. Without defendants' knowledge or consent, so far as shown, Jackson consented to a sale of their interest in it to Gillett, and after forfeiting the contract against Gillett traded off the farm. Waiver and estoppel are

in many respects analogous and said to often be convertible terms. The course this record shows Jackson pursued in relation to the contract affords in effect elements of both estoppel and waiver by conduct precluding his asserting the rights he now seeks to rely upon.

The judgment is therefore reversed, with costs to defendants.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.