### McCURDY v. VAN OS.

1. Vendor and Purchaser—Delivery of Assignment—Evidence.
   In equity suit to foreclose a land contract and have deficiency decree against the vendees and the several successive assignees, evidence *held*, not to justify finding that last assignment was ever delivered or tendered to, or procured by vendor at instigation of, a certain mesne assignee with whom vendor had had negotiations relative to satisfaction of his liability thereunder.

2. SAME—CONSIDERATION FOR RELEASE OF HOLDER OF VENDEE'S IN-
TEREST IN DEFAULTED CONTRACT—ESTOPPEL.

Vendor who obtained assignment of land contract vendee's in-
terest from the last assignees thereof, accompanied by keys to
the premises, leased portions to various tenants, and sought to
dispose of them to a mesne assignee during the two years
following such assignment which it procured in consideration
of release of its immediate transferor from liability under con-
tract then greatly in default, is bound by its course of conduct
and, two years thereafter, may not hold its transferor liable
on the contract.

3. SAME—ASSUMPTION OF LIABILITY—RELEASE OF LAST SUCCESSIVE
ASSIGNEE OF VENDEE'S INTEREST RELEASED ALL PREVIOUS HOLDERS.

The vendor's release of the last of successive assignees of the
vendee's interest in a land contract from liability thereunder,
each of whom had in turn assumed and agreed to perform the
terms thereof, terminated the liability of prior assignees who
had agreed to perform its terms.

4. SAME—ASSIGNMENT—LIABILITY OF ASSIGNEE.

In equity suit to foreclose a land contract whereby vendor sought
to hold the vendees and several successive assignees liable
thereon for deficiency, it is of no consequence as to liability
of the last of the assignees who assigned the contract and
turned it over to the vendor whether or not assignment ran to
the vendor or a mesne assignee of the vendee's interest and
was obtained by the vendor as an agent of such mesne assignee.

5. SAME—MESNE ASSIGNEE—DEFICIENCY—SPECIFIC PERFORMANCE—
FRAUD.

Vendor who had reached an oral agreement with a mesne assignee
of vendee's interest relative to sale of property with mortgage
back in settlement of such assignee's liability and thereafter
released the last assignee and took possession *held*, not entitled
to claim deficiency from such mesne assignee, where all as-
signees had assumed and agreed to perform the contract, since
all assignees were also released from liability thereunder and
specific mesne assignee sought to be held had not made a con-
tract which was specifically enforceable; there being no claim
of fraud, deceit, or bad faith on his part.

6. SAME—RELEASE OF LAST ASSIGNEE.

In equity suit to foreclose land contract and have deficiency
decree against the successive holders of the vendee interest,

where vendor procured an assignment thereof and took possession from the last assignee and thereafter dealt with the property in total disregard of the rights of anyone connected with the contract, none of the defendants would be liable for performance of the contract, where suit was started some two years later.

7. SAME—NECESSITY OF FORECLOSURE.
   A vendor has fee title to premises and, if he has possession and is not entitled to a deficiency decree against the original vendees or any of the assignees, has no need of prosecuting foreclosure proceedings.

8. SAME—CROSS BILL BY MESNE ASSIGNEES TO HOLD SUCCESSIVE ASSIGNEES FOR DEFICIENCY.
   In equity land contract foreclosure proceedings, cross bills of some of the mesne assignees who sought to hold their respective assignees who had assumed performance of the contract liable for deficiency in event cross plaintiffs were so held are dismissed where plaintiff's bill is dismissed.

POTTER and CHANDLER, JJ., dissenting in part.

Appeal from Kent; Perkins (Willis B.), J. Submitted June 6, 1939. (Docket No. 12, Calendar No. 40,109.) Decided October 20, 1939. Rehearing denied December 20, 1939.

Bill by Allan A. McCurdy, receiver of the Grand Rapids National Bank, against Richard Van Os and wife, Jacob Baart and wife, James H. Ruel, Arthur A. Northquist, and Frederick Wiersum and wife to foreclose a land contract and obtain a decree for a deficiency. Cross bill by defendant Northquist against defendants Wiersum to restore an assignment of a land contract and for deficiency and by defendant Ruel against defendants Northquist and Wiersum to restore assignments of a land contract and for deficiency. Decree for plaintiff. Defendants Northquist, Wiersum, Ruel, and Baart appeal. Reversed.

*James T. McAllister*, for plaintiff.

*Starr & Starr (James H. McLaughlin* and *Jay W. Linsey,* of counsel), for defendant Northquist.

*Rathbun & Arvidson,* for defendant Ruel.

NORTH, J. The receiver of the Grand Rapids National Bank instituted this proceeding in chancery to foreclose a land contract and to obtain a decree for deficiency, if any. Such a decree was entered in the circuit court in chancery for Kent county. Certain of the defendants, claiming there was error in entering a decretal provision for deficiency, have appealed.

In December, 1927, the Grand Rapids National Bank executed this land contract as vendor of described improved real estate in the city of Grand Rapids, the purchase price being $23,000. Jacob Baart and wife were the original vendees. There were five subsequent assignments of the vendees' interest: (1) In February, 1928, by Baart and wife to Richard Van Os and wife; (2) In August, 1928, by Van Os and wife to James Ruel; (3) in June, 1929, by Ruel and wife to Arthur A. Northquist; (4) In June, 1931, by Northquist and wife to Frederick Wiersum and Florence Wiersum, husband and wife; (5) And a fifth assignment in May, 1932, by Mr. and Mrs. Wiersum. When offered in evidence, the name of James Ruel was typewritten in the spaces provided in the printed form for the name of the assignee; but one of the controverted questions is whether at the time these last assignors executed this assignment it ran to Ruel as assignee or whether the assignment was in blank. But it is clear this assignment was executed and delivered by the Wiersums under an agreement with the bank that they were surrendering any interest they had in the contract in consideration of the bank as vendor releas-

ing the Wiersums from any and all further liability on this contract. In each of the assignments down to and including that of the Wiersums, the respective assignees assumed and agreed to perform the terms of the contract.

As between the parties to this appeal, their rights are determined by the character and effect of the transaction consummated at the time the Wiersums executed and delivered to the bank their assignment of the vendees' interest in May, 1932, at which time the contract was badly in default. No payments had been made after April 11, 1931; and a large amount of taxes was in default.

Plaintiff claims that among those who had held the vendees' interest in this contract defendant James Ruel was the one person who, as the bank's representatives understood, was financially responsible. As early as April, 1932, the bank was urging Ruel to care for this obligation, it having been assumed by him when he took an assignment of the contract in 1928. The testimony discloses that throughout 1932 Mr. Crimmins, cashier and vice-president of the bank, was carrying on negotiations with Ruel relative to his satisfying the bank's demands on this contract. Repeated interviews were had and correspondence passed. There was talk of having the contract re-transferred to Ruel. The negotiations led to an oral agreement that Ruel would make payments sufficient to reduce the unpaid contract obligation to $13,000, and thereupon the bank would deed the property to Ruel and take back a mortgage for $13,000. A deed bearing date June 27, 1932, and a mortgage of like date were prepared by the bank and submitted to Ruel, but neither instrument was ever executed. Later there were negotiations relative to reducing the unpaid balance of the contract obligation. In September a reduction of $500 was seem-

ingly agreed upon. Still later the bank agreed to accept a proposition from Ruel that he would pay the bank $5,000 and be released from further obligation on the contract; but this settlement was not consummated. During the course of negotiations Ruel offered to convey his interest in the contract property to the bank. On October 21, 1932, the deed and mortgage prepared by the bank were returned to it by mail. Negotiations continued between these parties, including consideration of Mr. Ruel's conveying certain properties to the bank in settlement of the contract. Nothing in the way of a consummated settlement resulted from these negotiations which continued at least until late in 1932 and possibly as late as the spring of 1934. In February, 1933, the bank closed for the banking holiday. It did not reopen, and nothing further of a definite character was done by Ruel relative to taking over the contract property or satisfying the obligation held by the bank, although there were numerous interviews between Ruel's representative, Mr. Amsden, and representatives of the bank. The bank's receiver filed this bill to foreclose the land contract July 21, 1934.

The facts above outlined are material as constituting a background which must be considered in determining the legal consequences of the assignment of their vendees' interest in this contract made by Mr. and Mrs. Wiersum in May, 1932. Admittedly this assignment was prepared by and was obtained at the instance of the bank. After execution by the Wiersums, it was delivered to a representative of the bank. And, together with both copies of the original contract, it was held by the bank until the trial of this case four years later. The Wiersum assignment was never accepted by Mr. Ruel. In behalf of the bank Mr. Crimmins testified:

"At that time (April 7, 1932) there was some talk (with Ruel) about getting Mr. Wiersum to transfer this contract over to Ruel. * * *

"*Q.* (*By Court*)  There was not any agreement to release the contract as far as the bank is concerned?

"*A.* None whatever. * * * When I made my oral contract with Mr. Ruel I was satisfied with that at that moment and was not looking to any of the other parties for pay. * * * The whole purpose of getting this assignment from Wiersum was so that we could go on and complete our deal directly with Ruel. * * *

"*Q.* Did Mr. Ruel ever instruct you to obtain the assignment for him, of this contract?

"*A.* I really don't know how to answer that. I know that was a part of the transaction with Mr. Ruel to put us in a position to deal with Ruel."

In regard to an interview with the bank's representatives had in the spring of 1934, two years after the Wiersum assignment, Ruel's representative, Mr. Amsden, testified:

"Mr. Uhl (then receiver of the bank) turned to Mr. De Graff (former vice-president of the bank and then employed by the receiver) and told him to take the papers to the bank's attorney and have whatever done as would be necessary to put the title to the property in the bank, to get the building fixed up, to rent it and some income coming in from it. That was in the spring of 1934."

Plaintiff's position was stated by its attorney to the trial court as follows:

"Ruel was in there going to make this deal and he made this proposition (to take over the property or adjust the contract obligation) because he was liable. They (the bank) were willing to take him, let the others out and in order to do that the transfer was made to Ruel with intent that the transfer from

Wiersum to Ruel, that was no cancellation of the contract by anybody."

But defendants contend that the bank in May, 1932, took the Wiersum assignment incident to the bank's desire and effort to settle the whole matter in the contemplated adjustment with Ruel which was then pending and as to which negotiations continued thereafter over a period of months; that whether the assignment was taken in blank or whether the bank, which prepared the assignment, made it run to Ruel as assignee, it was obtained by the bank in consideration of its agreement with Mr. and Mrs. Wiersum that by giving the assignment and surrendering their copy of the contract they would be released from all further liability upon the contract; and further that such release by the bank released, as a matter of law, all of the prior assignees (including Mr. Ruel) who had respectively agreed as assignees to perform the terms of the contract.

Decision turns upon the facts attending the Wiersum assignment. On this phase of the case we quote the following testimony. Mr. Henry Stone, employed by plaintiff bank as a manager of a branch it operated in Grand Rapids, and at which bank Wiersum did his banking business, testified:

"In 1932 I was called to the main office in connection with this property. * * * Mr. Woodhouse was credit manager. He asked me if Fred Wiersum had been in default on this contract for several months and he asked me at that time if I could get an assignment from Mr. Wiersum and his wife, to get an assignment on the contract and turn it back. I went and called on Fred Wiersum, * * * and asked him if he would assign this property back. * * *

"After I talked with Mr. Woodhouse I went to Mr. Wiersum and asked him if he would sign this

contract and give it up, and at first he said that he did not feel as though he wanted to because he had money into it. Well, after I talked to him and told him he could get out from under, in a way, *   *   * he would be through with it, he agreed to sign it, and he and his wife both signed the contract. *   *   * Mr. Woodhouse gave me the assignment to take to Mr. Wiersum. *   *   *

"I asked Mr. Wiersum at that time for his copy of the contract. I picked up, and took to the bank, his copy of the contract. I told Mr. Wiersum to have Paul Swanson, his bookkeeper, take the keys to the premises to the main office. Mr. Woodhouse told me to have him deliver the keys to the main office of the Grand Rapids National Bank.

"*Q.* Mr. Woodhouse did not tell you anything about having the keys delivered to Mr. Ruel, did he? *   *   *

"*A.* No, sir. *   *   *

"*Q.* What did Mr. Woodhouse tell you that you were to tell Mr. Wiersum as to his being released from liability?

"*A.* He told me if Mrs. Wiersum and Mr. Wiersum would sign this assignment, they would be out from under this contract. *   *   * Then I told him (Mr. Wiersum) he would be relieved of any further liability if he would surrender the contract. *   *   * I asked him (Mr. Wiersum) if Mr. Swanson would take the keys down to the bank. Mr. Wiersum said that would be done. *   *   * I am now an employee of the reorganized bank but not in the same position. *   *   *

"I am not sure that the top and blank spaces (in the assignment) were filled out when I took it to Mr. Wiersum. *   *   * I do not recall who the assignment was payable to. *   *   * When I took that up to Wiersum to sign I did not know that it was a transfer to Ruel, or who it was made payable to, because I do not recall whether it was filled in or not. *   *   * It might have been blank."

Mr. Woodhouse, the bank's credit manager, was not called as a witness; and therefore the above testimony as to his part in this transaction is not disputed.

Defendant Frederick Wiersum, referring to his conversation with Stone when the latter was endeavoring to obtain the assignment of Wiersum's interest, testified:

"When he came to me in May, 1932, he asked me if I would assign my rights. * * * That is all he said, and I told him * * * I had too much of an equity in it. If the bank wanted to give me something for my equity, I will turn it over to them. He left at that time and came back again the next day. He then told me it was for my own good, that I could take and assign this building back to the bank so as to relieve me from all obligations on the building. * * * He brought in a couple of assignments and I signed them and gave him the contract. * * *

"At the time this assignment was brought to me by Mr. Stone it was in blank form. It was brought to me in blank. The way it is now filled out from me and my wife Florence to James H. Ruel, * * * was not in there at the time I signed it. I signed that assignment in blank. * * * The name James H. Ruel wasn't in there when I signed it. There was nothing in there at all. * * * I returned the keys to the bank. This was all done in May, 1932. * * *

"At that time he (Stone) asked me to turn over this interest I had in the property to the bank. He said if I would do that I would be relieved of all further obligations of the contract. That was the consideration I turned this contract over to the bank. * * * At that time he (Stone) said it would be to my interest to do that, and I finally said, under those conditions I would turn it over to the bank. I did sign in blank these two assignments that are here in evidence and I did deliver the two assignments to Mr. Stone. * * * Since that time I have had

nothing at all to do with the building. Since that time the bank has not made any demands upon me for payment.''

Further, as bearing somewhat upon the issue as to whether the Wiersum assignment was taken in blank or ran to Ruel, witness Paul Swanson testified:

''I am employed by Fred Wiersum. I was employed by him in May, 1932. * * * That is my signature as a witness on that assignment (Wiersum's) of a contract. * * * I don't believe the typewriting (Mr. Ruel's name) was in it at the time I witnessed Wiersum's signature.''

Unfortunately Mr. Ruel, a man 80 years of age, was so ill from diabetes and heart ailment at the time of the trial that his testimony could not be procured; nor was the testimony of Mr. Robertson, who represented Ruel in the earlier part of his negotiations with the bank, obtainable. On this account the record is none too satisfactory as to what part, if any, Ruel had in securing the Wiersum assignment, or what, if any, knowledge he had of it. There is no testimony that Ruel requested the bank to secure the Wiersum assignment; but instead it convincingly appears that the bank understood or assumed it was going to close the deal with Ruel by deeding the property to him, with a $13,000 mortgage back, and for the purpose of consummating this transaction the bank secured Wiersum's assignment. Plaintiff's witness Crimmins testified:

''Of course, it was with the sanction of the bank that this assignment was obtained from Wiersum to Ruel. The bank was negotiating with Mr. Ruel prior to that time and possibly after that time. It finally had gotten down to where we had made the full agreement with Ruel as evidenced by the deed and mortgage and note offered here in evidence. The

only thing that was needed to consummate the deal was his signature and the payment of the ——.''

But neither the negotiations for deeding the property to Ruel nor any of the other negotiations between him and the bank resulted in a consummated transaction; and the bank was left holding the Wiersum assignment. We are satisfied from the testimony that the bank, over a period of more than four years between its receipt of the Wiersum assignment (May, 1932) and the trial of this case (June, 1936), held possession of the assignment and also of the vendees' duplicate of the original contract which Wiersum surrendered to the bank's agent. Notwithstanding appellee's contention to the contrary, we are of the opinion the testimony does not sustain its contention that the Wiersum assignment of the contract was ever delivered to Mr. Ruel or even ever tendered to him for delivery. On rebuttal Mr. Crimmins testified:

''Mr. Ruel knew all about this assignment that was made by Frederick Wiersum and Florence Wiersum to him. * * * He knew every detail of this deal. After that assignment was made to him these negotiations were pending all along there from that time on.''

But even in the light of this testimony it cannot be said that the Wiersum assignment was obtained at the instigation of Mr. Ruel or that it was ever delivered to him.

Another phase of this record which has a material bearing upon the position in which the bank now finds itself is whether the bank in fact repossessed the property at the time of taking the Wiersum assignment in May, 1932. The undisputed testimony is, as hereinbefore noted, that Wiersum at that time surrendered to the bank the vendees' duplicate of the

original contract together with the keys of the building. Likewise the undisputed testimony discloses that since the Wiersum assignment no other party to this litigation except the bank had any use or control of or income from this property or paid anything on the contract obligation during the period of upwards of four years intervening between the Wiersum assignment and the hearing of this suit. During this time an agent of the bank placed a sign on this property advertising that it was for sale. The bank rented the property. While these rentals were seemingly for short periods and not of much financial benefit, the bank placed two separate tenants in the first story of the building and at least one or two other tenants in the second story. On different occasions the bank repaired the property. Conclusively the bank's attempts to sell this property to Ruel after it took the Wiersum assignment were wholly inconsistent with any possible claim on the part of the bank that at that time any assignee of a vendees' interest under this original contract had any rights thereunder with the possible exception of Ruel. It seems almost too clear for argument that at the time the bank was negotiating for the sale of the property to Ruel in 1932, at which time it had taken over the keys and full possession of the building, and even possessed the vendees' duplicate of the original contract, the bank was handling the property and dealing with it on the assumption that it had the right to dispose of this property in total disregard of any possible interest of the original vendees or any of the subsequent assignees of the vendees' interest. The bank is bound by its course of conduct and cannot now be heard to say in its suit instituted approximately two years after the Wiersum assignment that Wiersum is still liable on this contract. The bank's continued course of conduct estops it from now as-

suming a different and inconsistent position relative
to this transaction. It is elementary that if the bank
by its dealings with Wiersum released him, such re-
lease terminated the liability of prior assignees who
had agreed to perform the terms of this contract.
*Barnard* v. *Huff*, 252 Mich. 258 (77 A. L. R. 259);
*Gorman* v. *Butzel*, 272 Mich. 525.

While it is quite unnecessary to do so, it may be
again noted in passing that the undisputed evidence
shows the bank secured Wiersum's assignment on
the express agreement that in consideration of the
giving of this assignment he and his wife would be
released from any and all further obligation inci-
dent to the performance of this contract. This alone
is sufficient to necessitate the holding that Wiersum
was released; and thereby the preceding assignees
of the contract were likewise released from their
respective assumptions of the contract obligation.
And under such circumstances, as bearing upon the
release of the Wiersums, it is of no consequence
whether the assignment was taken in blank by the
bank for itself or whether it ran to Ruel and was
obtained by the bank for Ruel as his agent or repre-
sentative.

The only close question in this case is whether the
bank should have a decree for deficiency against de-
fendant Ruel. The testimony discloses that it was
incident to the negotiations for a sale of the prop-
erty by the bank to Ruel that the bank obtained the
Wiersum assignment and accepted surrender of the
vendees' copy of the original contract. There is tes-
timony that Ruel definitely agreed to consummate
the deal whereby the property was to be deeded to
him by the bank and he was to give back a $13,000
mortgage. As noted above, it was not possible to
obtain Ruel's testimony disclosing his version of
these transactions. But Ruel's agreement to take

a deed of the property was only an oral agreement and therefore unenforceable. It is a fair inference from the record that the reason Ruel did not complete some of the transactions negotiated between him and the bank was that Ruel found himself financially unable to do so. There is no testimony of fraud or deceit or any attempt to mislead on the part of Ruel, or for that matter on the part of any other of these litigants. If Ruel had been guilty of bad faith, fraud, or deceit, a logical result in this suit might be to hold Ruel estopped from now claiming to be released from the obligation to perform this contract which was embodied in the assignment which he took in 1928. There is not only no testimony justifying such a disposition of this case, but the theory upon which the plaintiff has asserted its right to a deficiency decree is not based upon fraud, deceit, or bad faith on the part of Ruel.

We are mindful plaintiff claims that, in taking over possession, control and use of this property following Wiersum's assignment, its action was prompted by a desire to preserve the property from acts of vandalism, deterioration, et cetera, and for the interest of all parties concerned; and not for the purpose of exercising its right of forfeiture and abrogation or cancellation of the contract. Our conclusion, after careful review of the testimony, is that instead of so acting in an effort to preserve the property, the bank at that time felt reasonably certain it was going to resell the property to Ruel. With that in mind it accepted the Wiersum assignment, took possession of the property, and at least until the time the bank placed this matter in the hands of its attorney over two years later, it was proceeding on the assumption that it owned the property and was at liberty to deal with it in total disregard of anyone's rights in connection with the Baart contract.

This being true, the bank must remain where it placed itself. The result is that none of the appellants were liable for performance of the contract at the time this suit was instituted.

From this record we conclude that plaintiff bank took an assignment of the vendee's interest in the land contract either in blank or to defendant Ruel for whom it had no authority to act, and in consideration of such assignment from Wiersum and wife fully released the latter from all liability on the contract; that thereafter the bank took possession and full control of the contract property over a long period of time and dealt with it in total disregard of any rights therein either by the original vendees or any of their assignees, none of whom were asserting any rights under the contract. In so doing the bank rescinded and cancelled the contract. It holds the fee title and, not being entitled to a deficiency decree against the original vendees or any of their assignees, has no need of prosecuting foreclosure proceedings.

In view of our conclusion above indicated, defendants Ruel and Northquist are not entitled to the relief prayed in their respective cross bills, i. e., that in event either of them is held liable for a deficiency he be given a decree for such deficiency against those who subsequent to him became assignees of the vendee's interest in this contract.

A decree may be taken in this court dismissing plaintiff's bill of complaint as to appellants. Costs of both courts to appellants.

Butzel, C. J., and Wiest, Bushnell, and Sharpe, JJ., concurred with North, J.

Potter, J. (*dissenting in part*). I do not agree that "it is elementary that if the bank by its dealings with Wiersum released him, such release terminated

the liability of prior assignees who had agreed to perform the terms of this contract. *Barnard* v. *Huff*, 252 Mich. 258 (77 A. L. R. 259) ; *Gorman* v. *Butzel*, 272 Mich. 525.'' Nor do I think the cases cited so hold.

1. There is a wide difference between a land contract and a mortgage. *Hooper* v. *Van Husan*, 105 Mich. 592; *Jones* v. *Bowling*, 117 Mich. 288; *Curry* v. *Curry*, 213 Mich. 309; *Cady* v. *Taggart*, 223 Mich. 191; *Jackson* v. *West*, 224 Mich. 578; *Craig* v. *Black*, 249 Mich. 485; *Genyk* v. *Nagrich*, 255 Mich. 189; *Lutz* v. *Dutmer*, 286 Mich. 467.

''The rights of mortgagor and mortgagee differ from those of vendor and vendee. The mortgagor holds the fee; the mortgagee has a lien. The vendor holds the fee; the vendee had an equitable interest.'' *Cady* v. *Taggart, supra.*

''The vendee gets the equitable title, but the legal title still remains in the vendor, and is held as security for the payment of the purchase price. *Hooper* v. *Van Husan*, 105 Mich. 592.'' *Lutz* v. *Dutmer, supra.*

''The foreclosure of mortgages is one of the ancient equitable remedies. Its object is simply to enforce a lien upon lands by making it absolute unless redeemed.'' *Michigan Ins. Co.* v. *Brown*, 11 Mich. 265.

''Under the original equitable jurisdiction there never was any power to make a personal decree against even the mortgagor himself.'' *Johnson* v. *Shepard*, 35 Mich. 115.

''The power to render a deficiency decree in mortgage foreclosure cases is purely statutory. It is a substitution for a legal action and must be governed by the rules which would apply at law. *Michigan Ins. Co.* v. *Brown*, 11 Mich. 265; *McCrickett* v.

*Wilson*, 50 Mich. 513; *Vaughan* v. *Black*, 63 Mich. 215; *Winsor* v. *Ludington*, 77 Mich. 215; *Kelly* v. *Gaukler*, 164 Mich. 519; *Kollen* v. *Sooy*, 172 Mich. 214; *Union Trust Co.* v. *Detroit Trust Co.*, 243 Mich. 451; *Janower* v. *F. M. Sibley Lumber Co.*, 245 Mich. 571; *Bleakley* v. *Oakwayne Farms Co.*, 265 Mich. 268; *Wurzer* v. *Geraldine*, 268 Mich. 286." *Lutz* v. *Dutmer, supra.*

2. "A suit on a mortgage in England is not a suit to collect money, but one to get land, whereas a bill by a vendor is always to get his money, and the lien on the land is only a means of collecting it in whole or in part." *Fitzhugh* v. *Maxwell*, 34 Mich. 138, 141.

"The claim of the vendor is but an ordinary money debt, secured by the contract." *Walker* v. *Casgrain* 101 Mich. 604, 608.

"A vendor, as well as a vendee, is entitled to specific performance. If the defendant had made large payments, the complainant would be entitled, upon failure to make further payments when due, to file his bill for specific performance, and in the nature of a foreclosure bill, and in such case would be entitled to a sale of the land and decree for deficiency." *Loveridge* v. *Shurtz*, 111 Mich. 618.

"A bill filed strictly for specific performance usually asks a decree for the whole consideration, and the vendor, complainant, if he would have the entire consideration awarded to him by the decree, must be able to perform the contract. Where the consideration sought is the payment of money only, this proceeding amounts substantially to a foreclosure, as it gives the vendor a decree for money due by the terms of the contract, and, by sale of the equitable title of the vendee, subjects the premises to the payment of the same. This proceeding is favored, as it enforces no forfeiture." *Gray* v. *Hill*, 105 Mich. 189.

"It is well settled that specific performance is granted in favor of the vendor of land as freely as in favor of the vendee, though ·the relief actually obtained by him is the recovery of money, the purchase price." *Pearson* v. *Gardner,* 202 Mich. 360 (L. R. A. 1918 F, 384).

In 25 Halsbury's Laws of England, p. 408, it is said:

"Specific performance of a contract is ordered at the discretion of the court in cases where damages do not afford a complete remedy; and although, since *a vendor's claim is, strictly speaking, merely a pecuniary demand,* and damages would sufficiently compensate him, yet the court acts on the principle that the remedy must be mutual, and, therefore, specifically enforces the contract at the suit of the vendor in every case where a similar remedy is open to the purchaser."

In support of this statement, *Cox* v. *Middleton,* 2 Drew. 209 (23 L. J. Ch. 618, 61 Eng. Rep. 699); *Haywood* v. *Cope,* 25 Beav. 140 (27 L. J. Ch. 468, 4 Jur. [N. S.] 227, 53 Eng. Rep. 589); *Scott* v. *Alvarez,* L. R. 59 Ch. Div. 603; *Adderley* v. *Dixon,* 1 Sim. & St. 607 (57 Eng. Rep. 239); *Regent's Canal Co.* v. *Ware,* 23 Beav. 575 (53 Eng. Rep. 226); and *Cogent* v. *Gibson,* 33 Beav. 557 (55 Eng. Rep. 485), are cited.

*Barnard* v. *Huff, supra,* and *Gorman* v. *Butzel, supra,* were based upon the theory of novation—the making of a new and substituted contract in the place and stead of the original contract.

In *Gorman* v. *Butzel, supra,* it was said:

"The equitable situation is that the assignee becomes primarily liable for the purchase price and the vendee is his surety," citing *Barnard* v. *Huff.*

In *Barnard* v. *Huff, supra,* it was said:

"As between the assignor and the assignee, the latter becomes the principal debtor and the former a surety * * * and the principles of subrogation apply."

The language of these two cases is a misapplication of elementary principles. These statements are gratuitous *dicta*.

In *Crawford* v. *Edwards*, 33 Mich. 354, it was held that the acceptance of a deed by a grantee from a grantor, in which the grantee assumes and agrees to pay, binds the grantee as effectually as though the deed had been executed by the grantee. If the grantee merely accepted a deed of the premises, subject to the mortgage, "in such a case the property would be made primarily liable for the debt, but the grantee would not have assumed, and would not be personally liable for its payment." It was said:

"Of course the vendor would not be discharged upon his grantee's making such a promise, except at the option of the mortgagee. The mortgagee may treat both the vendor and his grantee as principal debtors to him, and have a personal decree against either or both. * * *

"The principle upon which this rests is, that the creditor is entitled to the benefit of all collateral obligations for the payment of the debt, which a person standing in the name of a surety for others has received for his indemnity, and to relieve him or his property from liability for such payment."

This case establishes that *the land mortgaged* is originally and primarily liable.

On foreclosure of a mortgage, the suit is not one primarily to collect money, but one to get land. *Fitzhugh* v. *Maxwell, supra; Lutz* v. *Dutmer, supra.*

When the mortgagor becomes a grantor to a grantee who assumes and agrees to pay the mortgage, the grantor parts with his title to the land which passes to the grantee and as the grantee who has assumed and agreed to pay in consideration of acquiring the land the grantee then becomes primarily liable. But the mortgagor and grantor is still liable upon the theory that he is a surety. As between the grantor and his grantee who assumes and agrees to pay the mortgage, the mortgage is in fact paid. *Miller* v. *Thompson,* 34 Mich. 10. But that does not affect the rights of the mortgagee who may still have recourse on equitable foreclosure to the liability of both the mortgagor and his grantee. In *Miller* v. *Thompson, supra,* Macklin mortgaged the premises to Miller. He then deeded to Thompson who assumed and agreed to pay. It was said:

"It was not essenial there should be a novation; it was sufficient that Thompson, as between himself and Macklin, had agreed to pay the mortgage. That agreement brings the case within the equity of the statute which provides that 'if the mortgage debt be secured by the obligation or other evidence of debt of any other person besides the mortgagor, the complainant may make such person a party to the bill, and the court may decree payment of the balance of such debt remaining unsatisfied, after a sale of the mortgaged premises, as well against such other persons as the mortgagor, and may enforce such decree as in other cases.' "

In *Higman* v. *Stewart,* 38 Mich. 513, the liability of the grantee of lands, who assumed and agreed to pay the mortgage, was extensively discussed. It was said:

"The doctrine has been maintained in two forms. The *first,* where a special agreement has been made between the *seller* of the equity of redemption and

the *purchaser* that the mortgage debt shall be considered purchase money, but be left in the hands of the purchaser for the use of the mortgagees: and this, it has been said, affords a valid basis for a direct claim by the mortgagee against the purchaser thus holding the mortgage debt for his use. * * *

"The *second* form accorded to the doctrine is that the grantee upon consideration agrees with the grantor to pay his debt, whereby as between them the grantee becomes principal debtor and the grantor his surety; and in accordance with the principle which in equity entitles the chief creditor to receive the benefit of a security held by a surety, the mortgagee creditor is entitled to the benefit of the agreement made by the purchaser of the equity of redemption. * * * In this aspect the doctrine does not contemplate an obligation from the grantee to the mortgagee, but a promise from the former to the mortgagor which may be caused to inure by an equitable subrogation to the mortgagee's benefit."

This case holds that originally the mortgagor is primarily liable because he is the owner of the land subject to the mortgage. When he sells the land to a grantee who assumes and agrees to pay the mortgage, the grantee becomes the owner of the land, the grantor parts with his title thereto, the mortgage is primarily a lien upon the land, the liability follows the land, the grantee becomes primarily liable and, if he does not perform the contract with his grantor in writing to pay the debt of the grantor which he has assumed and agreed to pay, the grantor still remains liable and there can be no discharge of liability without an express agreement to that effect to which the mortgagee is a party.

In *Hicks* v. *McGarry,* 38 Mich. 667, it was said:

"We have held that in a foreclosure proceeding in equity, the mortgagee might, where as in this case the mortgage was included in the purchase money,

be so far subrogated to the mortgagor as to have the benefit of such an obligation. The reasons for this are peculiar to equity. * * *

"But we have held in *Pipp* v. *Reynolds*, 20 Mich. 88, and *Turner* v. *McCarty*, 22 Mich. 265, that no action at law will lie by a third person against a promisor who has promised to pay an obligation from a debtor of such person, but who has had no dealings with the creditor."

This principle has been repeatedly restated. *Tapert* v. *Schultz*, 252 Mich. 39; *Fender* v. *Feighner*, 265 Mich. 536; *Lutz* v. *Dutmer, supra.*

In *Corning* v. *Burton*, 102 Mich. 86, Burton and Ellsworth owned the property. They mortgaged it to Corning. Burton then deeded to Dickerson who assumed and agreed to pay one-half of the mortgage. Ellsworth then deeded to Dickerson who assumed and agreed to pay one-half of the mortgage. Dickerson then deeded to McQueen who assumed and agreed to pay the mortgage. The executors of Corning then foreclosed the mortgage, making Burton, Ellsworth, Dickerson and McQueen defendants. The court held that a personal decree, might be rendered in a foreclosure case against a grantee of the mortgagor who has accepted a deed stating that it is subject to the mortgage which the grantee assumes and agrees to pay. It was said:

"Doubtless equity would say that McQueen was primarily liable, Dickerson next, and the mortgagors last; but all are liable. To hold otherwise would be to say that Dickerson could escape his personal liability, and compel the mortgagors to pay, by deeding to an impecunious person who should assume the debt."

McQueen was primarily liable because he was the owner of the land and had assumed and agreed to

pay the mortgage debt. Dickerson was liable next because he owned an entire interest in the premises and had assumed and agreed to pay the mortgage debt. The mortgagors were finally liable because it was their debt which had not been paid.

There is nothing in these cases which holds that the owner of a mortgage is compelled to join all of the persons who have assumed and agreed to pay the mortgage. He may foreclose his mortgage as against the mortgagor. He may choose not to proceed to enforce liability against one who has assumed and agreed to pay the mortgage. He may do so or he may not do so. His proceeding on foreclosure of a mortgage *is a proceeding against the land.* The personal liability of the mortgagor and of subsequent grantees of the mortgagor who assumed and agreed to pay are secondary. But in a land contract, *the proceeding is brought for the enforcement of a personal liability.* The proceeding is not one to foreclose a lien. The vendor has legal title and the discharge of the equitable title by sale of the premises is only incidental to specific performance. In the case of the foreclosure of a mortgage, the proceeding is to enforce a lien, to convert the mortgage lien into an absolute title, to acquire by foreclosure against the specific property title to the land. In case of a mortgage foreclosure, the owner of the land who has assumed and agreed to pay is primarily liable because the land is primarily liable and, as a grantee who has assumed and agreed to pay, he is in possession of the land. But in case of a land contract, the assignee of the vendee is not primarily liable. The person who is primarily liable is the vendee. He is the person who has contracted the debt. The claim of the vendor is but an ordinary money debt secured by the contract (*Walker* v. *Casgrain,* 101 Mich. 604; *Fitzhugh* v. *Maxwell,*

*supra; Lutz* v. *Dutmer, supra*), and the release from liability of a person who has acquired the land is no release of the vendee from his money debt without an express novation to which the vendor or his grantee is a party. In the foreclosure of a mortgage, a release from liability of the last assignee of the mortgagee who assumes and agrees to pay it is a release of the lien upon the land, which land is primarily liable and, therefore, amounts to release of liability of prior assignees. But in the foreclosure of a land contract, the vendor or his grantees have the title to the land, the amount due on the land contract is a personal liability, and the release of liability of the last assignee of the vendee who has assumed and agreed to pay the debt in no way affects the liability of the original vendee or prior assignees of the contract and in no way affects the title to the land which still remains in the vendor or his grantees.

In this case, however, if the bank, after it accepted the assignment from Wiersum, took possession of the property, proceeded on the assumption that it owned it and dealt with it as the owner thereof in total disregard of the contract for a period of two years with the acquiescence of the vendee and his subsequent assignees, there was in effect a payment and discharge of the contract obligation by an acceptance of the consideration therefor and personal liability on the contract upon the part of the original vendee and his subsequent assignees is at an end. On this ground, I concur with the result reached by Mr. Justice NORTH.

CHANDLER, J., concurred with POTTER, J. MC-ALLISTER, J., did not sit.